UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10161-RCL |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

SENTENCING MEMORANDUM OF SEKOU SILLAH

_____Now comes the defendant through counsel and respectfully requests this Court to

sentence him to time served.  Mr. Sillah has been in custody in connection with this case since

November 1, 2004, so at the time of sentencing, on September 27, 2005, Mr. Sillah will have

been in custody for ten months and 26 days.  In support of this request, Mr. Sillah asserts first

that U.S.S.G. §2S1.3 (b) (3) applies to his conduct, so that his offense level is 6.  As he plead

guilty, that level is reduced by two under § 3E1.1 (a), resulting in a total offense level of 4.

Since he has no prior record, his guideline imprisonment range is 0-6 months and the sentence

of time served is appropriate.  In the alternative, if the Court does not find that U.S.S.G. § 2S1.3

(b)(3) applies, the defendant asks the Court to exercise its power pursuant to 18 U.S.C. § 3553

and the Supreme Court's decision in United States v. Booker and United States v. Fanfan, 125

S. Ct. 738 (2005) and impose a sentence (time served)  below the range which would result from

application of the federal sentencing guidelines.

I. Introduction

Sekou Sillah's personal history and information about his activities in the United States

are set out in the Presentence Investigation Report and will not be repeated in detail here.  The

following facts, however, are critical to understanding Mr. Sillah's sentencing argument:

1.  Sekou Sillah is a forty-five year old native of Liberia with less than three years of formal schooling.  Other than being charged with offenses resulting from his having pirated DVDs and CDs in his possession, Mr. Sillah has no prior criminal history whatsoever.

2.  Mr. Sillah came to the United States in 1997 in order to try to make money to support this wife and three children and approximately forty other family members in West Africa.  He began earning money with a West African friend by selling sundries, such as bed sheets and African-style clothing, on the street in Roxbury near Dudley Station.  Eventually he stopped selling on the street and instead would put his merchandise in a rolling suitcase and go from barbershop to barbershop, selling his wares.  Eventually, a West African man whom he had known in Africa who ran a money remitting business in New York City asked Mr. Sillah to be his "agent" in Boston for the money remitting business.

3.  Mr. Sillah has many family members who live in the Boston area.  They are well-educated, hard-working, well-respected members of the West African community in Boston.  Mr. Sillah is an active member of that community.  Many of the West Africans whom Mr. Sillah did business with in Boston were childhood friends of his from West Africa.

4.  Mr. Sillah is not a violent person, nor is he is dishonest.  Ironically, it is because Mr. Sillah is a trustworthy, respected member of his community that he was successful at the money remitting business.  Many West Africans in the Boston area trusted Mr. Sillah with their money and this trust was never betrayed.

5.  Mr. Sillah provided a service to the West African community by assisting them in remitting money to their family members in West Africa.  His service was faster, cheaper, more reliable, and more convenient to the recipients than other services such as Western Union.  He was not victimizing anyone.

II.  U.S.S.G. §2S1.3 (b) (3) applies to Mr. Sillah's conduct.

U.S.S.G. § 2S1.3 applies to convictions for unlicensed money transmitting businesses and provides for a base offense level of six plus an additional number of levels depending on the amount of funds involved. The guideline also contains a "safe harbor" provision that reduces the offense level to six if a defendant meets four requirements (A)-(D):

(A) subsection (a) (2) applies and subsections (b) (1) and (b) (2) do not apply; (B) the defendant did not act with reckless disregard for the source of the funds; (C)the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose.

U.S.S.G. §2S1.3 (b) (3).

Subsection (a) (2) applies and subsections (b) (1) and (b) (2) do not apply.[1]  Thus the questions to be resolved are whether Mr. Sillah acted with reckless disregard for the source of the funds, whether the funds were the proceeds of lawful activity, and whether the funds were to be used for a lawful purpose.

---

[1](a) (2) applies because the defendant was not convicted under 31 U.S.C. §5318 or 5318A; (b) (1) does not apply because the defendant did not know the funds were the proceeds of unlawful activity nor does the offense involve bulk cash smuggling; (b) (2) does not apply because the defendant was not convicted of an offense under subchapter II of chapter 53 of title 31, United States Code.

Mr. Sillah did not act with reckless disregard for the source of the funds he collected, nor were the funds the proceeds of unlawful activity. Mr. Sillah knew practically every one of his customers, and they were all hard-working West African immigrants who were sending money which they had earned at legitimate jobs back to their families in Africa. The fact that he was collecting money from regular, working people is supported by the government's evidence concerning the size and number of the transactions involved. The government provided counsel with a binder recording all of the transactions the defendant is known to have engaged in from March, 2002, to November, 2004 in which the defendant collected funds from customers. There are approximately 4,102 total transactions listed. Out of that number, only thirty-one transactions are for more than $3,000.[2] In addition, counsel notes that while the government exhaustively investigated Mr. Sillah's business dealings, including bringing several of Mr. Sillah's customers to the grand jury to testify, to counsel's knowledge no evidence was uncovered that the funds Mr. Sillah collected were derived from criminal activities, that any of his customers were criminals, or that any of his customers were sending money overseas for nefarious purposes.[3]

---

[2]Nine of the thirty-one transactions are over $5,000, and the two largest of these nine are for $10,000. Counsel received a telephone call from a woman, Natouma Sano, who sent $8,000 at one time. This woman told counsel that she had saved the money so that three members of her family could go on a pilgrimage to Mecca. She was too afraid, however, to write an affidavit for Mr. Sillah.

[3]The government's statement of facts, set out in the Presentence Report, contains records titled "Versement" which look as if Mr. Sillah was remitting large bulk sums. These sheets, however, represent summaries from the company in New York of the money that Mr. Sillah had sent over time. "Barry Ibrahima," and "Balde Alimou" are persons in New York to whom Mr. Sillah was sending the money he had collected from West Africans in the Boston area. Some of these lists note irregular transactions, such as money that was not able to be delivered in Africa and was to be returned to the sender, or money that was being sent into the United States by

The money Mr. Sillah helped remit to Africa was to be used for lawful purposes.  It is common knowledge that many Africans depend on the money sent to them by their relatives in the United States.  Mr. Sillah's business was reliable, cheaper than Western Union, and provided the money in more convenient locations in African than Western Union did.

Attached to this memorandum are affidavits from regular customers about the source of their money, and the legitimate use to which it was to be put in Africa.  All but two of these affidavits were dictated to counsel in person.[4]  The affiants all know Mr. Sillah and know him to be a trustworthy person.  A typical statement is in the first affidavit, written by Mohamed Kaba, who has lived in the United States for nineteen years, has no criminal record, and works two jobs:

> In the past two years, I frequently gave money to Sekou Sillah to send to my family in Guinea.  I would send a few hundred dollars at a time.  This money was not the proceeds of criminal activity.  I made this money at my jobs at Roxbury Community College and at Management Strategy, where I am an account clerk.
>
> The money I sent was not going to criminal activities.  I sent the money to my family members to use for living expenses.  They used the money to buy food, clothing, and medicine.
>
> I did not want to use Western Union because some of my family members do not have Western Union offices available where they live.  They live in the interior of Guinea and it would be very difficult for them to travel to the Western Union office.  I also used Sekou's service because I have known him for many years, and it was easy to use him to send the money.  It is very common for Africans in

someone in Africa, for example, to pay for someone's schooling here.

[4]There are ten affidavits attached to this motion.  Two of them were written by Mr. Sillah's relatives (one by his brother and one by his nephew).  One of them, from Varney Yengbeh, does not have to do with the money remitting business but has to do with Mr. Yengbeh's crediting Mr. Sillah with helping him to find his lost relatives in Guinea.  Counsel met approximately nineteen other customers of Mr. Sillah's who expressed their support for him but said that because of what had happened to Mr. Sillah they were too afraid to write affidavits.

> Boston to send money back to their relatives. Many of the families there rely heavily on the money that is sent back to them from the United States. The money I sent to my family was crucial to them for surviving in Guinea.

Mr. Sillah's knowledge concerning the source of the funds he remitted and the purposes to which the funds were going was vetted in a lengthy meeting with the prosecutor and government agents in this case. Mr. Sillah willingly met with government representatives and told them everything he knew about the money remitting business and all his other activities in the United States. He answered questions about particular customers and transactions about which the government expressed interest. He was truthful and was ready to assist the government in whatever way he could.

In the context of Mr. Sillah's culture, he was providing a service, necessary and useful, to his fellow West Africans. He was not cheating anyone or harming anyone in any way. He has met his burden of demonstrating the lawfulness of the source of the money and the purpose of the funds he remitted. The Court should find that U.S.S.G. §2S1.3 (b) (3) applies to Mr. Sillah's conduct and sentence him to time served.

II.   18 U.S.C. § 3553 (a) considerations.

The Court should consider factors under 18 U.S.C. § 3553 (a) and impose a sentence which is "sufficient but not greater than necessary" to achieve the purposes of sentencing as set out in the statute. *Booker*, 125 S. Ct. at 757. A sentence of time served is appropriate given the considerations set out below.

A. <u>Nature of the offense  (§ 3553 (a) (1))</u>.

Mr. Sillah's criminal conduct was non-violent and he did not victimize anyone.

B. <u>History and characteristics of Mr. Sillah</u>
<u>(18 U.S.C. §§ 3553 (a) (1) and 3661)</u>.

As noted above, Mr. Sillah's personal history is set out in the Presentence Report.  He is not a violent or even dishonest person.

Mr. Sillah has already spent over ten months in custody, the first time he has been incarcerated in his life.  A sentence of time served would permit Mr. Sillah to return to Guinea and resume supporting his wife and children there.  Mr. Sillah's family has suffered severe financial hardship since he has been incarcerated here and has also endured personal tragedy, for example, one of his daughters recently was sexually assaulted.

C. <u>The need "to protect the public from further crimes of the defendant" (§ 3553 (a) (2) (C)</u>.

Mr. Sillah will be deported when he finishes serving his sentence so no one need worry that he will ever again remit money from West Africans in Boston to their relatives in West Africa.



D. <u>The need for the sentence to reflect the seriousness of the offense, to</u>
<u>promote respect for the law, and to provide just punishment for the</u>
<u>offense (§ 3553 (a) (2) (A))</u>.

The requested sentence satisfies the above concerns.  Ten months' imprisonment is enough for Mr. Sillah to serve for this crime.

III. <u>Conclusion</u>

For the reasons listed above in part II, the defendant asks the Court to find that U.S.S.G. §2S1.3 (b) (3) applies and that Mr. Sillah's offense level is 4 and his guideline range is

0 to 6 months.  For the reasons listed above in part III, if the Court does not make the finding

requested in part II, the defendant asks the Court to exercise its discretion under 18 U.S.C. §

3553 and sentence the defendant to time served.

SEKOU SILLAH
By his attorney,
/s/ Page Kelley
Page Kelley
  B.B.O. #548237
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

Dated: September 20, 2005

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

## AFFIDAVIT

1. My true name is Mohamed Kaba. I reside in Roxbury, Massachusetts. I am a native of Liberia. I have lived in the United States since 1986. I have no criminal record.

2. I have known Sekou Sillah for approximately 15 years. I know him to be a truthful person. He has been very honest in all the activities I know him to be involved in. I know him to have an excellent reputation in the African community here.

3. In the past two years, I frequently gave money to Sekou Sillah to send to my family in Guinea. I would send a few hundred dollars at a time. This money was not the proceeds of criminal activity. I made this money at my jobs at Roxbury Community College and at Management Strategy, where I am an account clerk.

4. The money I sent was not going to criminal activities. I sent the money to my family members to use for living expenses. They used the money to buy food, clothing, and medicine with this money.

5. I did not want to use Western Union because some of my family members do not have Western Union offices available where they live. They live in the interior of Guinea and it would be very difficult for them to travel to the Western Union office. I also used Sekou's service because I have known him for many years, and it was easy to use him to send the money. It is very common for Africans in Boston to send money back to their relatives. Many of the families there rely heavily on the money that is sent back to them from the United States. The money I sent to my family was crucial to them for surviving in Guinea.

Mohamed Kaba
08-10-05

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

<u>AFFIDAVIT</u>

1. My true name is Hawa Kaba. Muhamed Kaba is my husband. I reside in Roxbury, Massachusetts. I am a native of Guinea. I have lived in the United States since 1999. I have no criminal record.

2. I have known Sekou Sillah since I came to the United States in 1999. I know him to be a truthful person. He has a reputation as being a very nice person in the African community here.

3. In the past two years, I frequently gave money to Sekou Sillah to send to my family in Guinea. I would send a few hundred dollars at a time. This money was not the proceeds of criminal activity. I made this money at my job at Nare African Hairbraiding Salon in Dorchester.

4. The money I sent was not going to criminal activities. I sent the money to my mother to use for living expenses. She is in her sixties. She does not work because it is a very bad economy there. She is completely dependent on the money I send her to live. Sometimes I would get a call from my brother asking for extra money for her, because she was sick and needed medicine.

5. I did not want to use Western Union because it was hard for my mother to get to the Western Union office. Also I do not think she had identification to get her money from Western Union. Sending the money through Sekou was cheaper and also more convenient.

signed under penalties of penalties

Hama Rasa
08 - 10 - 05

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )     CRIMINAL NO. 05-101-RCL |
| | ) |
| | ) |
| SEKOU SILLAH | ) |
| | ) |

## AFFIDAVIT

1. My true name is Vambah Sillah. I am Sekou Sillah's half brother. I reside in Dorchester, Massachusetts. I am a native of Liberia. I have lived in the United States for thirty years. I have no criminal record.

2. I know Sekou's reputation in the African community in Boston. He has a reputation as being an honest, honorable person in African community here.

3. In the past two years, I frequently gave money to Sekou Sillah to send to my family in Guinea. I would send a few hundred dollars at a time. This money was not the proceeds of criminal activity. I made this money at my job at as a computer operator at Boston Water and Sewer Commission. I have had that job for the last twenty-four years.

4. The money I sent was not going to criminal activities. I sent the money to my family for living expenses. If there were medical expenses I would send money. My family also used the money for food, rent, and tuition for school.

5. I sent the money through Sekou because with his service the rate was lower than Western Union. Also Western Union is not as accessible as Sekou's service.

Signed under the pains and penalties of perjury:

_____

8/10/05

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

## AFFIDAVIT

1. My true name is Mohamed Diakhate. I am Sekou Sillah's nephew. I reside in Mattapan, Massachusetts. I am a native of Senegal. I have lived in the United States for four and a half years. I have no criminal record.

2. I know Sekou's reputation in the African community in Boston. He has a reputation as being an honest person.

3. In the past few years, I frequently gave money to Sekou Sillah to send to my family in Guinea. I would send a few hundred dollars at a time. This money was not the proceeds of criminal activity. I made this money at my job at Walgreens, where I have worked for almost two years.

4. The money I sent was not going to criminal activities. I sent the money to my family for living expenses.

5. I sent the money through Sekou because some of my family do not have access to Western Union offices. Some of my family members are 500 miles from the nearest office. Also, with Western Union the person getting the money does not get nearly as much money as with Sekou's service.

Signed under the pains and penalties of perjury:

_____  08-10-05

## AFFIDAVIT

1. My true name is Mohamed Fofana. I have known Sekou Sillah for approximately six years. I reside in Roxbury, Massachusetts. I am a native of Liberia. I have lived in the United States since 1989. I have no criminal record.

2. I know Sekou's reputation in the African community in Boston. He has a reputation as being an honest person. Everyone knew that he was a credible person as they trusted him with their money. I totally trusted him.

3. In the past few years, I frequently gave money to Sekou Sillah to send to my family in Guinea, Liberia, and Sierra Leone. I would send a few hundred dollars at a time. This money was not the proceeds of criminal activity. I made this money at my job at the MBTA in Boston, where I have worked for almost eight years. I am a bus driver.

4. The money I sent was not going to criminal activities. I sent the money to my daughters and my mother for living expenses. I have two children there, as well, and two adopted children (my brother's children, he passed away) whom I support.

5. I sent the money through Sekou because the family got more of the money through his service than through Western Union. Also Sekou was a very reliable person, and very trustworthy, and I knew that if I gave him the money it was safe with him.

Signed under the pains and penalties of perjury:

8/10/05    MOHAMED. M. FOFANAH

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

## AFFIDAVIT

1. My true name is Thomas Grupee. I have known Sekou Sillah about four years. I reside in Dorchester, Massachusetts. I am a native of Liberia, but I am now a United States citizen. I have lived in the United States about 22 years. I have no criminal record.

2. I am a licensed used car dealer, my company is called T and G Auto Broker. My office is in the same building with the office of Sekou's brother, Abraham Sillah, who runs a travel agency. I met Sekou through Abraham. We became good friends. I know him to be a very good friend and family man. I would trust him with anything; he is a very good man and honorable. I personally knew two of the people who did business with him, sending money back to West Africa. I knew these people to be honest, hardworking people who were not involved in criminal activity. They were sending money small amounts of money, a few hundred dollars. They were sending this money to their family members for living expenses. People were using him to send money to their families because they trusted him.

Signed under the pains and penalties of perjury:

Tom Grupee

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

### AFFIDAVIT

1. My true name is Varney A. Yengbeh, Jr.. I have known Sekou Sillah since 1995 or 1996. I reside in Arlington, Massachusetts. I am a native of Liberia. I have lived in the United States about 22 years. I have no criminal record.

2. In 1995, I traveled to Guinea to look for my family in the middle of the civil war in Liberia. Upon arrival in Conakry, Sekou had arranged for a person to assist me in traveling from one refugee camp to another to look for my family. I had not seen my family for ten years. As a way to help me, Sekou persuaded a person to be my guide. I found my family in the Gbounodou refugee camp, supervised by the United Nations and the International Rescue Committee. I strongly feel that without Sekou's help, I would not have been successful in finding my family.

3. Since Sekou's arrival in Boston, I have met him on several occasions at Liberian community or family events and we have always had a very good relationship. I have no reason to believe that he would be involved in any criminal activity. I believe he is an honest and trustworthy person. I have no reservations about his character at all.

Signed under the pains and penalties of perjury:

_____ 8/10/05

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

## AFFIDAVIT

1. My true name is Abraham Sherif. I have known Sekou Sillah for about 5 years. I reside in Stoughton, Massachusetts. I am a native of Liberia but I am a United States citizen.

2. I n the past few years I gave Sekou money to send to Guinea many times. I sent a hundred dollars or slightly more each time. The money was honest money that I earned. I earned this money as a cab driver. I have had this job for about 15 years.

3. I was sending the money to my brother. He used it for living expenses.

4. It was cheap to send the money through Sekou and I never had a problem with my brother receiving it in Guinea. Sekou is a very nice, kind-hearted person.


Signed under the pains and penalties of perjury:

*Abraham Sherif*

UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

## AFFIDAVIT

1. My true name is Abdoul Barry. I have known Sekou Sillah for about 12 years. I reside in Winthrop, Massachusetts. I am a native of Guinea but I am a United States citizen.

2. I n the past few years I have giving Sekou money to send to Guinea several times. I sent a hundred dollars or slightly more each time. The money was honest money that I earned. I earned this money as a cab driver. I have had this job for about 2 years.

3. I was sent the money to my family. They used it for food, medicine expenses.

4. I find it cheaper and easier to send the money through Sekou and I never had a problem with my family receiving it in Guinea. Sekou is a honest and trustworthy.


Signed under the pains and penalties of perjury:

_____  ABDOUL BARRY

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-101-RCL |
| | ) | |
| | ) | |
| SEKOU SILLAH | ) | |
| | ) | |

AFFIDAVIT

1. My true name is Mufa Fofana. I have known Sekou Sillah for over 8 years. I reside in Roxbury, Massachusetts. I am a native of Liberia but I am a United States citizen.

2. I know Sekou Sillah's reputation in the African community in Boston. Everyone considers him to be an honest man. A lot of people trust him with their money, because he is known to be reliable.

3. In the past few years I frequently used Sekou's money service to send money to my relatives in Guinea. I sent amounts between $100 and $1,000. The money I sent was from my job at the Marriott Hotel. I have worked for Marriott for 17 years.

4. The money was going to my relatives in Guinea. I have a big family there. They used the money for food, clothing, and other expenses they had.

5. I used Sekou to send money because it was cheaper than using Western Union.

6. I do not know anything bad about Sekou. He was very popular in the Liberian community: he knew everyone and no one had any problem with him. He was always present at weddings, birthday parties, funerals, and other community events. If someone was moving he would show up to help them out. He is religious and I sometimes went to the Mosque to pray with him. He is well-known and liked.

Signed under the pains and penalties of perjury:

_____